The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning. Our first case for argument today is 20-1561 and 20-1642, both Apple v. Qualcomm. Ms. Degnan, please proceed. Good morning, Your Honor. May it please the Court, Lauren Degnan for Apple. I'm going to start with the issue that is common to both appeals, which is Apple's standing. Apple has standing here because it has actual injury under MedImmune. Apple must continue to make payments to receive certain rights, which are identified in Paragraph 4 of Appendix 2910, and avoid the risk of trouble damages and injunctions, just like in MedImmune. Apple challenges its need to make those payments because the patents are invalid. Qualcomm doesn't rule that Apple has the burden of establishing standing. Has Apple established in this case the way it was established in MedImmune, that if it ceased to make any ongoing payment obligations, that that would have any impact on this case? So, Your Honor, Apple believes it has, and we would say that that's an issue that really goes towards redressability, and invalidating the two patents that are issued in this consolidated argument would remove one barrier to Apple's need to... One barrier, but in MedImmune, MedImmune was the only patent that was at issue in that particular license agreement. Here, I don't see that Apple has established that if it successfully invalidated this particular patent or either of these two, that it would then not have to make its payment. I'm trying to be careful. I'm sorry. The reason I'm stuttering is you guys have, like, peppered the record with little weird things about what's confidential, and so my questions may seem a little awkward, but I'm trying very hard to respect your requested confidentiality. No, we appreciate it, Your Honor, and we try to be helpful in that regard by putting a letter in yesterday to indicate where we think we can ask questions on public record. So, to answer your question, you're right. In terms of MedImmune, there were fewer patents at issue in that agreement, but the principle we think applies because... And to be clear, by fewer, we mean, like, orders of magnitude fewer, and many orders of magnitude fewer, in fact. Here, if you do have a license that maybe covers potentially, let's just say hypothetically, you have a license that covers an enormous number of patents. This is a pure hypothetical. Say you have a license that covers tens of thousands of patents, and you want to potentially have the right to bring an IPR on just one of those patents and then have us hear it on appeal, even though there's potentially no evidence in my hypothetical that it would have any impact on any potential payments that you're required to make under the license agreement, which may hypothetically cover hundreds of thousands of patents. So, if that were the case, why in the world would that confer injury, in fact, like MedImmune, when there is absolutely no established link between the payments that need to be made and the individual patent as opposed to maybe the 100,000 other patents in the potential license? So, Your Honor, what we would say to that is that the value of the patent license is a function of the values of the patents in it. And these particular patents are ones that Qualcomm has indicated are valuable to it because it sued Apple on them. It refused to give us an irrevocable license or permanent rights in it during the settlement. And to this day, it continues to refuse to stipulate that it will not. I'm sorry. I'm sorry. You are sort of not paying attention to my hypothetical. In my hypothetical, let's say there are 100,000 patents in the licensing agreement. And you have to pay, in my hypothetical, royalties, in my hypothetical, on the basis of all 100,000 any one patent gives rise to the obligation to pay as opposed to all of them. So, why would you have injury in fact to continue to fight over one patent when there's no evidence it would actually reduce the cost of your ongoing obligation? So, what we would say to that, Your Honor, is that we are entitled to attack those patents one at a time, removing the barriers one at a time, and that's under Apotex and Village of Arlington Heights. And so, you can't divorce the idea of payments under a patent license, no matter how many patents there are, from the idea that each patent itself has independent value. And so, otherwise, patentees would be able to avoid scrutiny of their patents under MedImmune by bundling a bunch of invalid patents together, hundreds of thousands of them. And we would say that given the courts and the Supreme Court's rules with respect to with that we are entitled to challenge those patents one at a time. And even though when you invalidate patent one of the 100,000, it's like 100,000 bottles of beer on the wall, when you finally invalidate patent one, it has absolutely no impact on your ongoing royalty payments. It's not until you actually invalidate patent 100,000 under that scenario, you still think that's squarely within MedImmune? So, Your Honor, what we would say is that it's not required to have no payments at all. And again, if I could just pull it back to the facts of our case, this license is time limited. And as you knock out... Counsel, in the facts of your case, and you had the obligation to establish standing, you gave us no evidence of how any potential payments are being allocated among what could be any number, a very large number of patents. You gave us no evidence. And you had the burden. You want to tell me now this is an important patent, but you gave me no evidence about anything related to the licensing agreement in this case. So, Your Honor, respectively, we would say we gave evidence that the patents had been asserted against us, and that they were carved out of the settlement agreement in terms of the validity challenge, and that the patents would be... was denied. And so, we would say that is evidence that indicates the relative value of these patents. But more importantly, we don't think the standing requirements in the issue of redressability requires to have a specific monetary savings per patent that is being invalidated. Come the termination of the agreement, whether on expiration or due to renegotiation, the number of patents remaining alive will matter. And I think that is under this court's jurisprudence, and that the value of a patent agreement, a license agreement, fundamentally depends on the value of the particular patents in it. This is Judge Huth. Can I ask a question? Why shouldn't we read the carve-out just as an opportunity for you to litigate these at an IPR, where you don't have to have any kind of standing to challenge validity, and not address the actual standing issue on appeal here? So, Your Honor, what we would say there is that there was really no debate that there was a case of controversy between the parties, and that the settlement resolved only part of it. And so, we would look at the carve-out as really cabining in what has been mooted from what would clearly be a case of controversy that gave Apple standing due to its injury, in fact. And the carve-out says that the invalidity issues have not been mooted. And what we would say with respect to that, you know, Aquamarine is the case in this court where it says- What do you mean when you say they have not been mooted? Do you just mean that the IPR is allowed to proceed, or that you're allowed to assert the invalidity argument in district court somewhere? Because it seems to me there's two different things here. If you wanted to continue to have a right to challenge the invalidity of this patent in district court, you should have somehow gotten a stipulation to that effect. But just agreeing for it to go forward to the board without any other stipulation doesn't say anything about whether you have standing to appeal to us. So, again, Your Honor, what we would say to that point is the dispute- There was a live case of controversy with respect to the validity of this patent that was not resolved by either the- That was not resolved by the settlement. It was not made moot by the settlement. The where that could be brought is completely open. And we're saying that since it was not mooted, the carve-out said we could continue to challenge invalidity. And because the invalidity dispute was not mooted, that counsel- Counsel, do you believe that through a settlement agreement, you are capable of negotiating standing for yourself? Or do you believe that is something that we as a court have to evaluate regardless of what the parties agree upon? No, Your Honor. Of course, we cannot negotiate standing for ourselves. So, we are not advancing that position at all. What I'm saying is that there was a live injury. There was an actual tangible injury to Apple that was- that remains live today because the settlement agreement did not moot it. So, this is Judge Reyna. Judge Warrick, may I ask a quick question? As many as you'd like, Judge Reyna. All right. So, the question I have is about timing and when Apple needed to have actually proven standing or shown a basis for standing. So, I ask, did Apple have a reasonable belief that jurisdiction was self-evident when it filed its opening brief? And if that's the case, then would that belief have been reasonable given that in the back of your mind, you know that the settlement dismissals existed with prejudice and you don't address them? And so, Your Honor, we think that we absolutely had a reasonable belief that we had standing in our opening brief. We identified and invoked this court's Article 3 jurisdiction by the- by indicating the jurisdictional statement. There is no- really no issue brought up about whether we had standing by anyone until very late in the proceedings. And I think- But yet, you were- you were aware- you're aware that back in the background, you do have the settlement and you have dismissals with prejudice. So, how can you say that you had a reasonable belief that you had standing when you filed your opening brief? So, Your Honor, I would say we had that belief because of the two kinds of injury. In fact, we have briefed up in the papers and there was no question in our mind that we did have standing. And the dismissal with prejudice did not prevent Qualcomm from someday, you know, did not take away our fear that Qualcomm would someday sue us. In fact, the fact that the license is term limited, it's refusal to give permanent rights- If you had that reasonable belief, then why didn't you allege it? Why didn't you argue it in your opening brief? So, Your Honor, we didn't argue it in opening brief because we may- because the issue was simply not one that was flagged as in dispute. And so, that is the reason. Then does this question turn on whether Apple had a reasonable belief that jurisdiction was or standing was self-evident? So, Your Honor, I don't think- I don't think it does. I think it turns on the fact that we have injury in fact to maintain this appeal and address the validity issues from the PTAC. Okay. Let's call it a reasonable belief of injury in fact to turn on the reasonableness of your belief of injury in fact. So, I don't think there's a sort of a mens rea component to this inquiry with respect to, you know, what we have to do in the opening brief. I mean, there's no reason to brief us issues that are not in dispute. And from our perspective, our standing was not in dispute due to our payments under the patent license as well as our reasonable- the reasonable likelihood that Qualcomm would reassert the patents they had already asserted against us in the future. And I will point out that Qualcomm did not raise this issue even in its docketing statement. So, there's no- there's no one- there's no reason for us to go into more details with respect to our standing. Okay. Thank you, Ms. Degden. Why don't we go ahead and hear from opposing counsel, Mr. Hall. Please proceed. Thank you, Your Honor. And may it please the Court. I'd like to start with a couple of points that were raised in the questioning. I think they go to critical aspects of Apple's allegation that they have standing. First, Judge Moore, I think your question regarding the actual link between this case or these cases and these patents with any particular injury that could be redressed is a critical one. And if you look at the only evidence Apple has submitted, which are the two declarations found in the record- and I'll use the appendix for 1561, though the declarations are identical- the appendix at 2910 and 2911, it's really important to note those declarations say nothing about either of the particular patents at issue in this case. They say nothing about any products Apple makes, plans to make, and as a result, can say nothing about whether those products have any functionality or operational characteristics that implicate either of the patents in this case. Well, Counselor, wouldn't- Yes, Your Honor. This is Judge Moore. Wouldn't the declaration have to go even further than that? Because we do have a six-year license agreement with a possibility of a two-year extension. The 037 patent, for example, by my calculation, expires in nine years. So wouldn't the declarations have to tell you that Apple intends to make products that it believes you at least think fall within the claims of the 037 patents eight years from now in order to have any potential argument about a very speculative and future infringement? Wouldn't they have to not only refer to the 037 patent, but refer with precision to products that it believes it will be making eight to nine years from now that could give rise to an infringement suit? Yes, Your Honor. There are two-I agree with Apple's counsel that there are really two injuries that I don't think Apple was incredibly clear about in their reply brief. But the one I think you're addressing now is the potential injury that sometime years from now there's going to be a lawsuit. Well, and what I find most interesting about that is, having read the actual complaint regarding the 037 patent, I discovered that that patent was asserted against iPhone 4 through 7, and it was asserted against iPhone 4 through 7 at a time when the iPhone 8 had already come out. So wouldn't Apple really have to tell us that eight years from now they still intend to make iPhone 4 through 7 to really be able to make the argument they want to make, which is eight years from now you might sue them because they intend to make the exact same product you've already accused of infringement? Well, and beyond that, Your Honor, they'd have to tell us where claim preclusion fits into that. Because again, these were dismissals of the entire case with prejudice for all parties. So it even goes beyond that. There's just-but, I mean, if you look at these declarations, these declarations weren't even for these appeals. They photocopied declarations for different appeals on different patents. So we know that there's nothing in these declarations that hits the requirement of the standing law that Apple link the outcome of these appeals to some injury. They simply can't. And to address Judge-I believe it was Judge Reyna's point about the question of, did Apple have a reasonable belief? I would note, if you look, for example, at 2910, this declaration was signed on June 26, 2020. That's within days and actually before one of the opening briefs, but within days of the other opening brief here in this case. If Apple thought it needed declarations going to non-record evidence to support standing at that time, why did Apple not believe that it needed evidence in these cases? And why did Apple not put in any evidence in its opening brief? If you look at the declarations, it's simply implausible that Apple thought it could argue just on a record, a record that included the dismissal of the claims under both of these patents. And I'd point the court, both final written decisions, the board pointed out the claims have been dismissed. That's in the final written decision. Counselor, I understand from the briefs themselves that there are a lot of potential related cases. I assume those are, am I right to assume those are other IPRs involving other patents that are arguably covered by the same licensing agreement? I believe I can say that. Yes, Your Honor. I mean, they're not marked confidential in the brief. So I hope I didn't tread on anything. You didn't, Your Honor. What I can say is that, you know, the rights that are identified in paragraph four of that declaration at appendix 2910, those are the identical rights referred to in these identical declarations across all the cases. Okay. And just out of curiosity, in those other cases, I didn't look myself to see at what stage they're in, but are they raising, standing in the blue briefs in those other cases? It depends on the case, Your Honor. Where Intel is the appellant, and there's, the cases include cases, frankly, there are three scenarios, right? There's Intel as an appellant, there's Apple as an appellant, and then there's Qualcomm as an appellant, depending, of course, on what the board did below. Where Intel is an appellant, we actually moved to dismiss. Because unlike the Apple situations, where it was in the record that the claims had been dismissed, and so we felt, you know, Apple knew it had to come up with evidence for standing, the Intel cases are less clear-cut just because Intel was not in litigation that got dismissed. So we filed motions to dismiss. Counsel, when we're looking at whether it had to be raised in the blue brief versus you bringing it up for the first time in the red brief, and that's really what this issue is about, my question to you is, isn't this really, don't those cases all devolve into a sort of waiver kind of analysis, which really leaves it at our discretion whether to treat it as something that had to be brought in the blue brief or not? Well, certainly, I mean, this court has discretion to make that decision, but I think the court was quite clear and hygienic. The reason that I ask you about whether we have the discretion to make it is because given the very, very, very large number of related cases and your acknowledgement that some of them raise the issue in the blue brief, some of them don't, does it really make sense for us to deem in this case it waived only to kick the can down the road? I mean, Your Honor, I think that it is important for the court to enforce the hygienics requirement that says that an appellant must raise it at the first time, either in the blue brief or in response to a motion. I think that's an important principle for this court. Yes, but you have had a chance and are fully exploring the issue. What prejudice is there to you necessarily from this? Well, actually, Your Honor, Apple has opposed our motion to enter our surreply, right? So, I mean, Apple doesn't want us to have the chance. Assuming we grant your motion, just assuming hypothetically we grant your motion for a surreply, is there really any prejudice to you? You've had an opportunity to fully flush out this issue and given the many other pending cases, doesn't it make sense to go beyond just the waiver point at that point based on our discretion? In these particular appeals, Your Honor, I think I'd agree with you. But I think there is a countervailing factor, which is that the court set out this requirement in hygienics to try to keep from having this voluminous briefing that you see in these sets of cases. And I think there is a value to the court, even from just kind of a pragmatic point of view of saying, we meant what we said in hygienics. Yes, of course, you have to have the voluminous briefing in all of the other related cases to counterbalance that. Right. And I agree with you, Your Honor. I think there's kind of weight on both sides, right? And this particular group of cases that involve Intel and Apple and Qualcomm, I see your point. But I think for the court looking forward beyond these, and this standing issue has come up a lot recently. So, I don't think this is the end of it. One thing I'd like to move you off of this and move on to the question of the potential estoppel that would attach if you were ever to, if Qualcomm were ever to assert this patent against Apple in the future, why doesn't, please address for me why you think the estoppel doesn't give rise to any injury, in fact, for Apple? Well, Your Honor, I think it's because this case, this court has been pretty clear that it does not. I don't think that's a question that seems to be still open with regard to this court's rulings. I'm sorry, which case, counsel, which case do you think is clear that it's not? I think both hygienics and AVX court include the point that the estoppel is not a sufficient basis for standing. That's a quote, actually, from the AVX corporation case, 923 Fed Third, 1357 at 1363. So, the court looked at this very issue. Does that estoppel in this scenario that eight years from now there's going to be some lawsuit despite dismissal of prejudice, despite not knowing what products Apple may or may not have, you know, in that scenario, we've got this potential estoppel long, far out, and AVX corp said it is not a sufficient basis for standing. So, we think that, you know, the court has looked at that issue. Counsel, counsel, can I talk to you for a second? I'm sorry, I'm just not familiar with this AVX corp case. Did you cite this to us? We did, Your Honor. If you look at our surreply, and I understand it's in our surreply, but in our surreply at page 11, this is in the 1561 appeal, Your Honor. If you look at the bottom of page 11, we cite the AVX corp where, you know, that we cite the fact that the estoppel does not provide a sufficient basis for standing. Does that answer your question, Your Honor? It does. Thank you. Sure. And obviously, we cited to the other cases I mentioned there, you know, the Phygenics case, as well as the General Electric case. I wasn't sure Phygenics actually said that, and I have to get AVX to look at it. And the reason I'm not sure about Phygenics is because Phygenics makes it clear that it's in the circumstances of that case, and in the circumstances of that case, you had a non-manufacturing company pursuing the IPR. So they weren't actually at that point during the IPR doing anything that could ever have even been accused of infringement. They couldn't have been subject to suit. They were just saying they might in the future want to license their patents. So that's why I wasn't sure the Phygenics case read so broadly as you wanted it to. But I have to admit, I didn't see the AVX case. So I'm going to have to pull that and look. You think that is more directly on point? I think it is. But Phygenics was saying, because there's no evidence in the record, right, that there's going to be an activity that could give rise to a possible infringement suit. And I posit, Your Honor, that's the same case here, right? There's nothing in these declarations that indicates that Apple's selling phones today. We all know they are. I'm not telling you they aren't. But the declarations are completely silent about current products, future products, let alone any relationship between current and future products and the actual patents at issue. So in terms of evidence, even taking into account the declarations Apple put in in its reply, if you look at that evidence, you'll find it's exactly as lacking as the evidence pointed to in Phygenics. And for the same reasons, the estoppel by itself cannot provide the basis for standing. With regard to the other argument that Apple makes, I think Your Honor did point out Apple hasn't gotten anywhere near what MedImmune said was required to have an injury based on a current agreement. Of course, we're referring here to the ongoing payment obligations of Apple. But if you actually look at MedImmune, rather than try to create this broad, bright-line rule that Apple wants of any licensee to 100,000 patent portfolio with ongoing payment obligations can go after any of them, MedImmune emphasized multiple times that the relief in the case was tied to actual change in circumstance. So at 128, the petitioner had put in evidence that no royalties are owing because the patent is invalid and not infringed. And then going ahead in page 131 and page 135, the Supreme Court kept referring back to that and saying there's an injury here because the record reflects at least a patentee assertion that these royalties are being paid under protest and that if this patent is invalidated, we won't be paying them, they won't be owed. None of that is found in the declarations in either of these appeals. The one thing we do hear from Apple is they say, oh, well, Apotex fixed that. Apotex said that, you know, as long as we're taking any sort of step toward a change that that does it for us. So I'd ask the court to look at Apotex, especially at page 1363, where this court said, if the and Apotex will gain substantial revenues. Judge Moore, can I take you backwards for a second? I'm now holding this AVX Corp opinion in my hand. Of course. Do you have a copy as well? I'm moving to it, but I do have a copy. Yes. I mean, I see the page that starts with the paragraph that begins with the word second. This seems to be where our court addresses the estoppel provision and whether it can be sufficient for an injury. In fact, what sentence would you direct me to that you believe holds that a potential estoppel is not sufficient to create injury, in fact? So, Your Honor, do you see where it's they say they reject the argument that AIA estoppel provides, and I'm quoting here, a sufficient basis for standing? No, where? Let's see. No, I don't see that. Where is it? I'm trying to find the best way to refer to it, Your Honor. Sorry about that. Give me a moment. I mean, I've got the opinion, so you can tell me the page number. Is it 1363? It's 13, I believe it's 1362, Your Honor. And it's right at the end. If you look, the language is actually, if you read the analysis of it actually bridges the pages of 1362 to 1363. Well, that's interesting. The court appears to interpret Phygenics quite differently than I did. It says, we have already rejected an invocation of the estoppel provision as a sufficient basis for standing. And it cites Phygenics. That's not what I thought Phygenics held. That being said, I guess I am bound by what ABX says Phygenics held, even if it's not what I thought it held. Is that right? That would certainly be our position, Your Honor. I mean, we can certainly discuss that, but it does seem like the court has, at least for a couple of years, made clear what, at least has made clear a position on what Phygenics holds, and certainly absent on bonkery hearing, that would seem to be the law of the court. Okay. Thank you, Counsel. Ms. Stegman will restore your full five minutes of rebuttal. Thank you, Your Honor. I wanted to address this issue of current and future products first, if I might. And of course, there is no dispute that Apple continues to make products. And Your Honor referenced the iPhones 4 through 7, but not the 8. The cardinal chemical tells us that a company once charged with infringement must remain concerned about the risk of similar charges if it develops and markets similar products in the future. And so that would give rise to a reasonable likelihood. But, Counsel, you don't have any evidence in this case that you intend to do that. Well, I mean, we've discussed the ongoing payment obligations. And so we are making payment obligations. We're complying with our obligation. You're making payment obligations relative to lots and lots of stuff. And so what you haven't indicated, I see nothing in any of these declarations that says you intend to continue making the same or similar products at all, much less that you intend to do so six to eight years down the road. Right. But I think there's no legitimate dispute that Apple will continue to make its extremely popular smartphone and smartwatches. And so, you know, in terms of when you say there's no dispute, with all due respect, I believe that opposing counsel stood up and said there's no evidence of exactly which products Apple does intend to make in the future or any linking of those products to the 037 patent, for example. So I believe he has not conceded that point. And you introduced no evidence of it. And you had the burden. So, Your Honor, let me address this notion of in a future suit, when we are making products, how claim preclusion might fit in. The fact that we might have a defense due to the dismissal of the previous lawsuit doesn't take away the reasonable likelihood that Qualcomm will continue to assert it and we would have to litigate the defense. I'm sorry, you introduced no evidence whatsoever about what Apple intends to offer for sale six years from now or eight years from now when this license expires. Are you asking this court to take judicial notice of the fact that Apple will still be selling its iPhones that could potentially fall within the scope of the 037 patent six to eight years from now? Is that where we have to go to find in your favor? So, Your Honor, I think the court certainly could take judicial notice that Apple is selling and will continue to sell its very popular smartphones and smartwatches. Sorry, this is Judge Hughes. Can I just interrupt and ask you a question? How is that kind of general assertion consistent with our precedent, specifically the 2G cases that requires a much more detailed connection between the patents and future products? You're just saying we're going to keep making phones and watches that could potentially infringe these patent claims, but you haven't connected that up and you haven't actually even said it in any specific declaration. I think your proof here or offer of proof here just fails under our precedent. You haven't lined up how the patents could potentially be infringed by future products, particularly ones significantly in the future in a fast-changing technological space. So, Your Honor, what we say here is those declarations have come into play when parties have never been on the market or not on the market. And it's very different from here, where Apple was on the market, was sued, all these specific patents, you know, giving rise to the case of controversy, that we're still fighting with respect to the invalidity. So, given the past, the historical past allegations, we think that the declaration cases you refer to are not really applicable. Why is that true? I mean, I don't understand why that's true. Are you saying that we should just assume that, you know, eight years from now, you're still going to be selling the phones that are the subject of this litigation, and so the infringement claims might come back? Or are you saying that the patents at issue cover technology that's going to be used eight years from now? I mean, both of those things seem to be not things that are obvious to me and that we could take judicial notice of. I think you have to assert those, and I don't think you have. So, respectfully, I understand where you're coming from with respect to the termination of the agreement at the expiration of its term. But we also, the agreement could be terminated for other reasons, which is, you know, our injury under Metamute, that while we continue to pay, we have this ongoing actual current injury that would be redressable by ruling in our favor. So, with that, Your Honor, we thank you for your time. Okay. We thank both counsel. The case is taken under submission.